UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JAMES FRED BARFIELD,

      Plaintiff,

v.                    Case No: 2:13-cv-566-FtM-29DNF

KEVIN RAMBOSK, in his
official capacity as Sheriff
of Collier County, Florida,
MICHAEL C. DIPAOLO,
individually, JAMES D.
CASEY, JR., individually,
MICHAEL D. CHAPMAN,
individually, and KASEY P.
WINGO, individually,

      Defendants.

---

**OPINION AND ORDER**

This matter comes before the Court on defendant Michael DiPaolo's Motion for Summary Judgment (Doc. #34), defendants Michael Chapman, James Casey, and Kasey Wingo's Motion for Summary Judgment (Doc. #35), and defendant Kevin Rambosk's Motion for Summary Judgment (Doc. #37) filed on December 18, 2014. Plaintiff filed Responses in Opposition (Doc. #46; Doc. #47; Doc. #48) on January 8, 2015.

**I.**

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Baby Buddies, Inc. v. Toys "R" Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010). A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Anderson, 477 U.S. at 251).

In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 380 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010). However, "if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999) (quoting Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296-97 (11th Cir. 1983) (finding summary judgment "may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts")). "If a reasonable fact finder evaluating the evidence could draw more

than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).  Where, as here, much of the event is captured on video tape, the facts are viewed "in the light depicted by the video tape." Scott v. Harris, 550 U.S. 372, 381 (2007).

**II.**

On the morning of July 29, 2011, plaintiff James Fred Barfield (Barfield or plaintiff), a seventy year old fishing guide, was driving his Chevrolet Suburban from his home in Everglades City, Florida to Naples, Florida, to mail a letter.  (Doc. #34-1, pp. 29-30.)  Barfield became dizzy during the drive and, in an abundance of caution, decided to pull into the Publix parking lot at Freedom Square Plaza.  (Id. at 31.)  Barfield called his doctor's office between 9:30 and 10:00 in the morning to inquire about his condition, but was unable to speak with his doctor at that time.  After leaving a message, Barfield intended to go to Publix to get some orange juice, but was unable to stand up when he exited his vehicle.  Barfield therefore elected to remain in his running vehicle until he heard back from his doctor.  (Id. at 36.)  The next thing plaintiff recalls is waking up in the hospital, shackled and handcuffed.  (Id. at 39.)

At around 9 p.m. that night, Sherry Dechert (Dechert), a manager at the Dollar Tree store in Freedom Square Plaza, called

the Collier County Sheriff's Department to report that a running vehicle with a fishing charter sticker[1] affixed to the door had been parked in the parking lot for approximately two hours. (Doc. #34-2.) As a result of the call, Michael DiPaolo (Deputy DiPaolo), a deputy with the Collier County Sheriff's Department, was dispatched to the scene. (Doc. #34-4, p. 8.) When Deputy DiPaolo arrived at Freedom Square Plaza, Dechert informed him that she was nervous because she thought she may be robbed. She also thought that the vehicle was suspicious because it had been idling for quite some time and was the only vehicle in the parking lot. (Id. at 10.)

Deputy DiPaolo shut off the headlights on his patrol vehicle and approached plaintiff's Suburban from the rear. (Id. at 11.) Deputy DiPaolo stopped behind plaintiff's vehicle and reported the vehicle's tag number to dispatch. (Id. at 12.) He then exited his patrol vehicle and approached the driver's side of the suspect vehicle to make contact with plaintiff, the only occupant. (Id. at 14.) As he approached, Deputy DiPaolo observed a white male sitting in the driver's seat with a large thermos in his hands. Deputy DiPaolo tapped on the driver's side window to get Barfield's attention and then inquired as to his business in the shopping

---

[1] The fishing charter sticker stated as follows: "CAPT. FRED BARFIELD, Fishing Guide, Everglades City, Florida, 239-xxx-xxx."

plaza. (Id. at 19.) Barfield, however, was unable to answer Deputy DiPaolo's question. Deputy DiPaolo noticed that plaintiff was swaying back and forth while sitting and attempting to place the large thermos in a small cup holder. Based on his observations, Deputy DiPaolo believed that plaintiff may have been under the influence of an intoxicating liquor or controlled substance. (Id. at 21.)

In order to further investigate Barfield's business in the shopping plaza and his possible intoxication, Deputy DiPaolo asked plaintiff to exit the vehicle. (Id. at 25.) Plaintiff complied with the request, but had to use the door frame to maintain his balance. Deputy DiPaolo asked plaintiff what his name was and he answered "Fred." (Id. at 26.) Deputy DiPaolo then asked plaintiff if he had been drinking, had any medical issues, or had taken any medication. Barfield said "no" in response to each question. (Id. at 32.) Barfield continued to sway back and forth during questioning and had to hold on to his vehicle to maintain his balance. On two occasions, Deputy DiPaolo had to reach his arms out to prevent Barfield from falling to the ground. (Id. at 33-34.)

Deputy DiPaolo then informed Barfield that he was placing him in handcuffs "for his safety and mine." (Doc. #34-5, p. 6.) When Deputy DiPaolo attempted to place the arm Barfield was using for balance in handcuffs, Barfield reached through the window frame

5

and pulled himself against the vehicle.  (Doc. #34-4, p. 47; Doc. #34-5, p. 6.)  Deputy DiPaolo ordered Barfield to stop resisting, but Barfield continued to brace and tense his body against the vehicle.  (Doc. #34-5, p. 6.)  Deputy DiPaolo then radioed for emergency assistance and ordered plaintiff to the ground.  (Doc. 34-4, p. 53.)  Plaintiff, however, failed to comply with Deputy DiPaolo's order.  As a result, Deputy DiPaolo deployed his agency issued taser into plaintiff's torso area for a full five second cycle, which caused plaintiff to fall to the ground.  (Id. at 54-56.)

Deputy Michael Chapman (Deputy Chapman) arrived at the scene approximately two minutes later and observed Deputy DiPaolo standing by Barfield.[2]  Deputy DiPaolo advised Deputy Chapman that he wanted to stand plaintiff up before securing him in handcuffs. (Doc. #34-4, p. 63.)  Barfield, with the deputies' assistance, struggled to his feet and immediately grabbed his steering wheel for balance.  (Doc. #39.)  Deputy Chapman tried to pull Barfield away from the vehicle, but was unsuccessful.  Barfield was then pushed towards the vehicle and Deputy Chapman ordered Deputy DiPaolo to deploy his taser.  (Doc. #34-4, p. 65; Doc. #34-6, p. 19; Doc. #39.)  Barfield once again fell to the ground.

---

[2]The dash camera in Deputy Chapman's patrol vehicle documented the rest of the encounter.

The deputies then pulled Barfield away from the vehicle and attempted to place him in handcuffs. (Doc. #34-4, p. 66.) Barfield continued to brace and tense when the deputies tried to place his hands behind his back. (Id. at 68.) As a result of Barfield's noncompliance, Deputy DiPaolo attempted to apply another five second taser cycle. Deputy DiPaolo, however, came in contact with one of the taser probes and was temporarily incapacitated by the shock from the taser. Deputy Chapman picked up Deputy DiPaolo's taser and gave Barfield a five second drive stun between the shoulder blades. (Id. at 69.) This was the third tase administered in a span of twenty-eight seconds.

At this point, Deputies James Casey (Deputy Casey) and Kasey Wingo (Deputy Wingo) arrived on the scene and joined in the struggle. After giving Barfield several orders to stop resisting, Deputy Casey discharged his taser in to Barfield's back and administered a five second cycle. (Doc. #34-5, p. 7.) Deputy Chapman was then able to apply one handcuff to Barfield's right arm. As soon as the handcuff was applied, Barfield pulled his arm away and grabbed hold of his belt loops. In an attempt to gain compliance, Deputy Chapman delivered five punches to Barfield's upper shoulder area. This too did not work. (Doc. #34-7, p. 3.) Deputy DiPaolo therefore elected to apply pepper spray to Barfield's facial area. (Doc. #4-5, p. 7.) Barfield finally let go of his grip and the second handcuff was secured on plaintiff's

left arm.  Collier County EMS arrived on the scene and transported Barfield to the hospital.  (Id.)

When Barfield woke up in the hospital, he was shackled and handcuffed to the bed.  (Doc. #34-1, p. 40.)  Barfield remained in shackles until August 1, 2011, and was released from the hospital on August 2, 2011.  (Doc. #34-1, pp. 48-49; Doc. #45-4, p. 1.)  After running a series of tests, the hospital learned that Barfield was not under the influence of alcohol or a controlled substance at the time of the incident.  (Doc. #45-4, p. 9.)  The hospital ultimately determined that Barfield had experienced a severe drop in blood sugar.  (Doc. #34-1, p. 45.)

Barfield was charged with resisting an officer without violence and resisting an officer with violence.  The charges were ultimately dismissed and Barfield's record was expunged.  (Doc. #34-5, p. 1.)

On August 9, 2012, Barfield filed a complaint with the Collier County Sheriff's Department.  An investigation was conducted by the department, which concluded with a finding of no officer misconduct.  Plaintiff therefore elected to initiate this action against Deputies DiPaolo, Chapman, Casey, and Wingo, as well as Collier County Sheriff Kevin Rambosk (Sheriff Rambosk).  Plaintiff's Amended Complaint, filed October 18, 2013, asserts the following claims: (Count I) violation of civil rights pursuant to 42 U.S.C. § 1983 against Sheriff Rambosk; (Count II) false arrest

and excessive force pursuant to 42 U.S.C. § 1983 against Deputy DiPaolo; (Count III) malicious prosecution pursuant to 42 U.S.C. § 1983 against Deputy DiPaolo; (Count IV) false arrest and excessive force pursuant to 42 U.S.C. § 1983 against Deputies Chapman, Casey, and Wingo; (Count V) negligence against Deputy DiPaolo; (Count VI) malicious prosecution against Deputy DiPaolo; (Count VII) assault and battery against Deputies DiPaolo, Chapman, Casey, and Wingo; and (Count VIII) negligent infliction of emotional distress against Deputies DiPaolo, Chapman, Casey, and Wingo.

### III.

Deputy DiPaolo and the other deputies contend that they are entitled to qualified immunity on plaintiff's claims for false arrest and excessive force.  These defendants assert that plaintiff's constitutional rights were not violated, and even if they were, the rights were not clearly established at the time of the alleged misconduct.

### A.   Qualified Immunity

"Qualified immunity protects government actors performing discretionary functions from being sued in their individual capacities."  Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003).  It offers complete protection so long as the government actor's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The doctrine of qualified immunity "balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The Eleventh Circuit has often said that qualified immunity protects "all but the plainly incompetent or one who is knowingly violating federal law." Brown v. City of Huntsville, 608 F.3d 724, 733 (11th Cir. 2010) (citing Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)).

"A government official asserting a qualified immunity defense bears the initial burden of showing 'he was acting within his discretionary authority.'" Valderrama v. Rousseau, 780 F.3d 1108, 1112 (11th Cir. 2015) (quoting Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007)).  "After the official makes this showing, the burden shifts to the plaintiff to show that '(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation.'" Valderrama, 780 F.3d at 1112 (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004)).  "To determine whether a right was clearly established, [the court] look[s] to binding decisions of the Supreme Court of the United States, [the Eleventh Circuit], and the highest court of the relevant state

(here, Florida)," Valderrama, 780 F.3d at 1112 (citing McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007)), and asks "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," Saucier v. Katz, 533 U.S. 194, 202 (2001).

Here, plaintiff does not dispute that defendants were acting within the scope of their discretionary authority at the time of the events at issue.  Therefore, plaintiff shoulders the burden of proving that qualified immunity does not apply.

**B.   Deputy DiPaolo**

In Count II of the Amended Complaint, plaintiff asserts claims for false arrest and excessive force pursuant to 42 U.S.C. § 1983 against Deputy DiPaolo.   Deputy DiPaolo contends that he is entitled to qualified immunity because there was no Fourth Amendment violation and the use of force was objectively reasonable.

**1.   Fourth Amendment**

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures" by the government. U.S. Const. amend IV.  For purposes of Fourth Amendment analysis, there are three broad categories of police-citizen encounters: (1) police-citizen exchanges involving no coercion or detention – which require no level of suspicion; (2) brief seizures or investigatory detentions – which require reasonable suspicion; and

(3) full-scale arrests – which require probable cause. <u>United States v. Perez</u>, 443 F.3d 772, 777 (11th Cir. 2006) (citing <u>United States v. Hastamorir</u>, 881 F.2d 1551, 1556 (11th Cir. 1989)).  The encounter between Barfield and Deputy DiPaolo progressed through all three phases of police-citizen encounters.

(a)  **Initial Encounter**

No law enforcement officer was involved in plaintiff's decision to stop his vehicle and remain in the parking lot for an extended time period.  Thus, there was literally no "stop" of any kind, and no Fourth Amendment "seizure" of plaintiff occurred.  Additionally, there was no Fourth Amendment event when Deputy DiPaolo approached the stopped vehicle and tapped on the window to gain plaintiffs attention and attempt to have a discussion with him.  "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.  Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." <u>United States v. Drayton</u>, 536 U.S. 194, 200-01 (2002) (internal citations omitted).  Plaintiff had stopped his vehicle a long time before, had remained there for his own reasons, and was not being detained

due to any law enforcement presence or actions.  Deputy DiPaolo's presence and interaction with plaintiff did not *per se* violate the Fourth Amendment.

**(b)   Request to Exit Vehicle**

The first conduct by Deputy DiPaolo which may implicate the Fourth Amendment is his request that plaintiff exit the vehicle. The law was clearly established that a law enforcement officer may, as a matter of course, order a driver to exit a vehicle when the officer has lawfully detained a vehicle for a traffic violation, even without any level of suspicion. Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977).  Similarly, an officer may order a passenger out of a vehicle during a stop for a traffic infraction without violating the Fourth Amendment, even if there is no articulable reasonable suspicion to detain the passenger. Maryland v. Wilson, 519 U.S. 408, 410, 414 (1997).  In both situations, the "legitimate and weighty" safety of the officer justified the procedure.  Mimms, 434 U.S. at 110; Wilson, 519 U.S. at 414-15.  See also United States v. Spoerke, 568 F.3d 1236, (11th Cir. 2009); United States v. Paul, 565 F. App'x. 780, 783 (11th Cir. 2014) (no Fourth Amendment violation in ordering driver to exit vehicle).

The Court finds there was no violation of the Fourth Amendment when Deputy DiPaolo requested plaintiff to exit the vehicle and plaintiff complied.  As noted above, there had been no Fourth

Amendment event in approaching the vehicle and attempting to converse with plaintiff, and it was a reasonable safety precaution for Deputy DiPaolo to ask plaintiff to get out of the Suburban. Even if reasonable suspicion was required, the Court finds that Deputy DiPaolo possessed such reasonable suspicion, as discussed below.

**(c)  Handcuffing Plaintiff**

Barfield argues that, even if his detention was constitutional at the outset, it ceased to be so once Deputy DiPaolo attempted to place him in handcuffs. It is clear that the use of handcuffs results in a "seizure" of an individual, since a "seizure" under the Fourth Amendment occurs when a government actor, by means of physical force or show of authority, in some way restrains the liberty of a citizen. Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968).

Fourth Amendment jurisprudence has long recognized that an officer must possess "an articulable and objectively reasonable belief that the suspect is potentially dangerous" before handcuffing the individual. Michigan v. Long, 463 U.S. 1032, 1051 (1983). It is not enough to merely say that the use of handcuffs was for "officer safety." See United States v. Acosta, 363 F.3d 1141, 1147-48 (11th Cir. 2004); Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1305-06 (11th Cir. 2006); United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000); Hastamorir, 881 F.2d at 1557;

14

United States v. Blackman, 66 F.3d 1572, 1576-77 (11th Cir. 1995). Accordingly, an officer can handcuff a person when the officer reasonably believes that the person presents a potential threat to safety.  Gray, 458 F.3d at 1305-06.  See also Gil, 204 F.3d at 1351; Hastamorir, 881 F.2d at 1557; Blackman, 66 F.3d at 1576-77; United States v. Lester, 477 F. App'x 697, 700 (11th Cir. 2012). An officer's action in handcuffing an individual, however, does not automatically convert a Terry detention into an arrest. Acosta, 363 F.3d at 1147-48.

As in Gray, Deputy DiPaolo was not handcuffing plaintiff to effect an arrest, but rather was doing so during an investigatory stop.  In such a situation, "an officer can still handcuff a detainee when the officer reasonably believes that the detainee presents a potential threat to safety."  Gray, 458 F.3d 1300-01 (citations omitted).  Additionally, the officer must have a lawful basis to continue the interaction, which has by virtue of the handcuffing become a Fourth Amendment event which requires at least reasonable suspicion.

### (d)   Reasonable Suspicion for Investigatory Detention

A police officer may conduct a brief investigatory detention of an individual "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989) (citing Terry, 392 U.S. at 30).

The question is whether "the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief that the action taken was appropriate.'" Blackman, 66 F.3d at 1576 (quoting Terry, 392 U.S. at 22). An officer may detain a person for investigation, even if unrelated to the stop's initial purpose where, under the totality of the circumstances, the officer has objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring. United States v. Arvizu, 534 U.S. 266, 273 (2002). The reasonable suspicion standard applies to "any curtailment of a person's liberty by the police." Jackson v. Sauls, 206 F.3d 1156, 1166 n.12 (11th Cir. 2000).

The reasonable suspicion of criminal activity "may be formed by observing exclusively legal activity, even if such activity is seemingly innocuous to the ordinary citizen." Lester, 477 F. App'x at 698 (quoting United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007)). However, "[t]he 'reasonable suspicion' must be more than 'an inchoate and unparticularized suspicion or hunch.'" United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000) (quoting Terry, 392 U.S. at 27). Courts must examine "the totality of the circumstances" to determine whether the police had "a particularized and objective basis for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273.

A seizure that is reasonable at its inception may quickly become unreasonable if it extends beyond its unique justification. Croom v. Balkwill, 645 F.3d 1240, 1250 (11th Cir. 2011). See Florida v. Royer, 460 U.S. 491, 500 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.").

In the qualified immunity context, an officer is entitled to qualified immunity if he has arguable reasonable suspicion for the seizure. "When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had arguable reasonable suspicion to support an investigatory stop." Jackson, 206 F.3d at 1166 (citations and internal quotation marks omitted). Thus, an officer "who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity." Id. at 1165-66. Whether arguable reasonable suspicion existed depends on whether "the totality of the circumstances create[d], at least, some minimal level of objective justification for the belief that [plaintiff] engaged in unlawful conduct." Blackman, 66 F.3d at 1576.

Here, there is ample such arguable suspicion to justify the decision to handcuff plaintiff.  The evidence shows that: (1)  The Collier County Sheriff's Office received a call reporting a suspicious vehicle that had been parked outside the Dollar General Store for approximately two hours; (2) Deputy DiPaolo was dispatched to investigate that running vehicle; (3) Deputy DiPaolo spoke with the person who made the call, and was given the same information and was told by Dechert that she was afraid of being robbed; (4) Deputy DiPaolo confirmed that plaintiff's Suburban was the only vehicle in that part of the parking lot, and was running; (5) Deputy DiPaolo tapped on the driver's side window to get the driver's (and sole occupant) attention; (6) plaintiff could not tell Deputy DiPaolo why he was parked in the shopping plaza; (7) Deputy DiPaolo observed plaintiff swaying back and forth while sitting in the vehicle; and (8) Deputy DiPaolo observed plaintiff attempt to put a large thermos in a small cup holder.  When asked what made Barfield dangerous, Deputy DiPaolo responded that "I do not know Mr. Barfield . . . I did not know what [] he was capable of, [or] what his intentions were." (<u>Id.</u> at 46.)  Deputy DiPaolo further testified that Barfield was cooperative and did not exhibit any rude, aggressive, combative, or evasive behavior. (<u>Id.</u> at 34, 44, 75.)  Taking all of these facts in combination, the Court finds that Deputy DiPaolo had reasonable suspicion (and hence arguable reasonable suspicion) that plaintiff was under the influence of

alcohol or a controlled substance.  Deputy DiPaolo reasonably requested plaintiff to exit the Suburban and reasonably decided to handcuff plaintiff, neither of which violated the Fourth Amendment.  E.g., United States v. Paul, 565 F. App'x. 780, 783 (11th Cir. 2014).

**(e)  Arrest**

It is clear that at some point in the attempt to handcuff plaintiff, the investigatory stop matured into an arrest.  The determination of "whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all the circumstances." Blackman, 66 F.3d at 1576 (citation omitted).  "It is clearly established that an arrest made without probable cause is a violation of an arrestee's clearly established Fourth Amendment rights.  In the context of § 1983, however, a police officer may be entitled to qualified immunity even if there was no actual probable cause for an arrest.  When an officer raises a qualified immunity defense in a § 1983 case, the officer will prevail if there was arguable probable cause for the arrest." Valderrama, 780 F.3d at 113 (citations omitted).  The existence of probable cause does not turn on the arresting officer's state of mind. Devenpeck v. Alford, 543 U.S. 146, 153 (2004).  So long as the circumstances known to the officer, viewed objectively, give probable cause to arrest for any crime, the arrest is

constitutionally valid even if probable cause was lacking as to some offenses, or even all announced charges.  Id. at 153–55; Lee v. Ferraro, 284 F.3d 1188, 1195–96 (11th Cir. 2002).  It is clear that plaintiff repeatedly resisted the efforts to handcuff him, thereby providing ample probable cause that he was violating the Florida resisting statute, Fla. Stat. § 843.01.  Accordingly, the Court finds that Deputy DiPaolo is entitled to qualified immunity on plaintiff's claim for false arrest.

### 2.  Excessive Force

Included in plaintiff's Count II claim for false arrest is a claim for excessive force.  Even if an officer has probable cause to arrest a person, the seizure must still be reasonable. Tennessee v. Garner, 471 U.S. 1, 8 (1985).  "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under" a reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989).  An officer's use of force is excessive if his actions are not "objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation."  Zivojinovich v. Barner, 525 F.3d 1059, 1072 (11th Cir. 2008) (internal quotation marks omitted).  Those circumstances must be viewed from the perspective of the law enforcement officer on the scene, id., rather than "with the 20/20 vision of hindsight," Graham, 490 U.S.

at 396.  An officer is entitled to qualified immunity from an excessive force claim unless every reasonable officer in his position would have concluded that his use of force was unlawful. Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir. 1997). Further, to be entitled to qualified immunity, "an officer need only have arguable probable cause" to employ force. St. George v. Pinellas County, 285 F.3d 1334, 1337 (11th Cir. 2002).  Courts "do not sit in judgment to determine whether an officer made the best or a good or even a bad decision in the manner of carrying out an arrest.  The Court's task is only to determine whether an officer's conduct falls within the outside borders of what is reasonable in the constitutional sense . . .  In the constitutional context, reasonableness-on a given set of facts-is 'a pure question of law.'"  Buckley v. Haddock, 292 F. App'x. 791, 794 (11th Cir. 2008).

In determining if the use of force was reasonable, a court must examine (1) the need for the application of force, (2) the relationship between the need and amount of force use, and (3) the extent of the injury inflicted.  Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008) (citing Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir. 2000)).  The nature and degree of force needed is measured by such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 196.

Viewing the undisputed facts in a light most favorable to plaintiff, the Court concludes that Deputy DiPaolo's use of force was objectively reasonable.  When Deputy DiPaolo used his taser for the first time, Barfield, who appeared to be under the influence of a controlled substance or alcohol, was actively resisting Deputy DiPaolo's efforts to handcuff him and failed to comply with the order to get on the ground.  Furthermore, Deputy DiPaolo was the only deputy on the scene at that time and the incident occurred at night.  Under these circumstances, a reasonable office could have concluded that there was a reasonable need for some use of force to effectuate the arrest.  See Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (holding that the use of a taser to effectuate an arrest did not constitute excessive force because its use was reasonably proportionate to the need for force given the suspect's repeated refusal to comply with the officer's verbal commands).

As to the continued use of force, the undisputed evidence shows that Deputy DiPaolo used his taser in response to Barfield's continued physical resistance.  Once it became clear that the taser was ineffective against Barfield, Deputy DiPaolo resorted to the use of pepper spray.  It was only then that the deputies were able to secure Barfield in handcuffs.  Because plaintiff clearly

resisted the deputies and posed a potential threat to their safety, the Court concludes that the forced used by Deputy DiPaolo was justified in this case. See Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306 (11th Cir. 2009) (concluding that the tasing of the plaintiff three times, which led to her eventual death, did not amount to excessive force where the plaintiff actively resisted the deputies' efforts at effectuating a lawful arrest); Buckley, 292 F. App'x at 796 (finding that qualified immunity applied where officer deployed taser on suspect who was handcuffed but continued to resist and refused to comply with instructions). See also Alday v. Groover, No. 14-11899, 2015 WL 364343, at *1-2 (11th Cir. Jan. 29, 2015) (holding that the use of a taser on a handcuffed plaintiff to bring compliance was not clearly established constitutional law).

Plaintiff has not demonstrated that Deputy DiPaolo violated his Fourth Amendment rights. Accordingly, Deputy DiPaolo is entitled to qualified immunity, and summary judgment is granted in his favor as to the claim for excessive force.

### 3. Malicious Prosecution

Plaintiff concedes that summary judgment in favor of Deputy DiPaolo is appropriate as to his claim for malicious prosecution under 42 U.S.C. § 1983. Deputy DiPaolo's motion for summary judgment is therefore granted as to Count III of the Amended Complaint.

**C.   Deputies Chapman, Casey, and Wingo**

Deputies Chapman, Casey, and Wingo argue that they are entitled to qualified immunity because it was reasonable for them to believe that Deputy DiPaolo's seizure of Barfield was supported by probable cause and the use of force was reasonable under the circumstances.

**1.   False Arrest**

The Eleventh Circuit has held that assisting officers are entitled to qualified immunity when there is no indication that they acted unreasonably in following the lead of a primary officer or that they knew or should have known that their conduct might result in a Fourth Amendment violation, even when the primary officer is not entitled to qualified immunity. Shepard v. Hallandale Beach Police Dep't, 398 F. App'x 480, 483 (11th Cir. 2010) (citing Brent v. Ashley, 247 F.3d 1294, 1305-06 (11th Cir. 2001)).

Here, the evidence shows that Deputies Chapman, Casey, and Wingo were dispatched to Freedom Square Plaza in response to Deputy DiPaolo's request for emergency backup.  As to Deputy Chapman, the evidence shows that Deputy Chapman, before arriving at the scene, knew that Deputy DiPaolo was dispatched to investigate a suspicious vehicle, had called for emergency backup, and had tased an individual.  (Doc. #34-6, p. 8.)  Based on this knowledge, it was reasonable for Deputy Chapman to follow Deputy DiPaolo's lead in

detaining Barfield.  As to Deputies Casey and Wingo, the evidence shows that they immediately joined the ongoing struggle when they arrived at the scene.  Because Deputies DiPaolo and Chapman were struggling to restrain Barfield when they arrived, it was reasonable for them to believe that Deputy DiPaolo had probable cause to arrest Barfield.  In short, nothing the deputies knew at the time they arrived at Freedom Square Plaza would have alerted a reasonable officer that their conduct might result in an unlawful arrest.  The Court therefore finds that Deputies Chapman, Casey, and Wingo are entitled to qualified immunity as to plaintiff's claim for false arrest.  See Shepard, 398 F. App'x at 484.

### 2.  Excessive Force

In light of the undisputed facts established in the record, the Court finds that Deputies Chapman, Casey, and Wingo's use of force in this particular situation was not outside the range of reasonable conduct under the Fourth Amendment.  Of particular importance is the fact that the deputies could not complete the arrest-that is, truly control Barfield-because Barfield was resisting.  The video shows that Barfield disregarded the deputies' orders and actively resisted the deputies' efforts to secure him in handcuffs.  It was only then that the deputies resorted to the use of physical force.  The continuing use of force was objectively reasonable due to Barfield's continued resistance.  See Buckley, 292 F. App'x at 796.  This is not a case where a compliant arrestee

was abused for no good reason.  Accordingly, the Court finds that the use of force by Deputies Chapman, Casey, and Wingo was not unconstitutionally excessive.  Summary judgment is therefore granted in favor of defendants as to Count IV of the Amended Complaint.

## IV.

In Count I of the Amended Complaint, plaintiff alleges that his unlawful seizure is directly attributable to Collier County Sheriff Kevin Rambosk's (Sheriff Rambosk) policy and custom of inadequate oversight, inadequate discipline of deputies despite a pattern of misconduct, and inadequate training of deputies in the execution of their law enforcement duties.  (Doc. #18-1, ¶ 49.) Sheriff Rambosk asserts that he is entitled to summary judgment on Count I because there is no evidence that Barfield's constitutional rights were violated as a direct result of the policies that were in place on July 29, 2011.

A plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal "policy" or "custom" that was the "moving force" behind the constitutional deprivation. Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-94 (1978)).  The government entity "must be found to have *itself* caused the constitutional violation at issue; it cannot be found liable on a vicarious liability theory." Skop v. City of Atlanta,

485 F.3d 1130, 1145 (11th Cir. 2007) (emphasis in original) (citing Monell, 436 U.S. at 694-95).   "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. . . . A custom is a practice that is so settled and permanent that it takes on the force of law." Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005) (quoting Sewell, 117 F.3d at 489).   "Proof of a single incident of unconstitutional activity is not sufficient to impose liability" against a municipality. Oklahoma City v. Tuttle, 471 U.S. 808, 823-824 (1985); see also Craig v. Floyd Cnty., 643 F.3d 1306, 1310-11 (11th Cir. 2011).

The Court has determined that plaintiff's constitutional rights were not violated.   Therefore, there is no need to consider policy or custom. Rooney v. Watson, 101 F.3d 1378, 1381-82 (11th Cir. 1996). See also Mingo v. City of Mobile, Ala., 592 F. App'x 793, 799 (11th Cir. 2014).   Even if plaintiff's constitutional rights were violated, summary judgment would still be appropriate because plaintiff has failed to establish that a custom or policy was the moving force behind the alleged constitutional violation.

## A.   Ratification

Plaintiff argues that Sheriff Rambosk's policies prohibiting arrests without probable cause and the use of excessive force are meaningless because the custom and practice of the Collier County

Sheriff's Department is to conduct an inadequate and cursory investigation of complaints filed with the department and to exonerate the offending deputy, regardless of constitutional issues. In essence, plaintiff contends that Sheriff Rambosk ratifies unconstitutional behavior by exonerating the offending deputy.

In order to establish liability under § 1983 under a ratification theory, plaintiff must show a "persistent failure to take disciplinary action against officers" who make arrests without probable cause and use excessive force, which "can give rise to the inference that a municipality has ratified conduct, thereby establishing a 'custom' within the meaning of Monell." Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir. 1985). See also Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir. 1994) ("A municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference toward the police misconduct.").

After reviewing the record, the Court finds that a detailed factual analysis of the investigation conducted in response to Barfield's complaint is unnecessary because plaintiff "cannot point to another occasion" when a deputy was exonerated for a constitutional violation. See McDowell v. Brown, 392 F.3d 1283,

1290 (11th Cir. 2004).   A single incident cannot be so pervasive as to be a custom "because a custom must be such 'a longstanding and widespread practice [that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it.'"[3]  Craig, 643 F.3d at 1310 (quoting Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991)). Barfield's own experience, which is, at most, proof of a single incident of unconstitutional activity, is "not sufficient to impose liability" under 42 U.S.C. § 1983.  Tuttle, 471 U.S. at 824.   Moreover, "[a]n inadequate investigation following the subject incident will not sustain a claim of municipal liability, because after-the-fact inadequate investigation could not have been the legal cause" of plaintiff's injuries.  Feliciano v. City of Miami Beach, 847 F. Supp. 2d 1359, 1367 (S.D. Fla. 2012). Furthermore, the Court has found that the current incident was not a constitutional violation.  Accordingly, Sheriff Rambosk's motion for summary judgment is granted as to this issue.

---

[3]A single incident will suffice under § 1983 when a final decision maker orders an action that violates federal law.  See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S 397, 406 (1997).  Plaintiff, however, does not seek to establish liability under this theory of municipal liability.

**B.    Failure to Train**

Plaintiff also argues that Sheriff Rambosk's failure to adequately train his deputies in the execution of their law enforcement duties was the moving force behind his injuries.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011).   However, a local authority's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  Id.   To satisfy § 1983, in a failure to train context, this failure "must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.   Only then can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  Id. (internal citations and quotations omitted).

The "stringent standard" of deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action."  Id.  When policymakers have "actual or constructive notice" that an omission in a training program causes employees to violate citizens' constitutional rights, "the city may be deemed deliberately indifferent if the policymakers choose to retain that program."  Id.  A "policy of inaction" can

be the "functional equivalent of a decision by the city itself to violate the Constitution." Id.

Here, plaintiff is unable to point to another occasion in which an individual was arrested without probable or subjected to excessive force. Furthermore, there is no evidence indicating that Sheriff Rambosk was on notice of the need to train his deputies in these areas. The absence of such evidence is fatal to plaintiff's argument. Before municipal liability can arise based on the failure to establish a training policy or procedure, "the need for such training must be plainly obvious to Department decision makers." Wright v. Sheppard, 919 F.2d 665, 674 (11th Cir. 1990). The need for training is not plainly obvious unless there is "evidence of a history or widespread abuse." Id. See also Rocker v. City of Ocala, Fla., 355 F. App'x 312, 314 (11th Cir. 2009). As such, the Court finds that Sheriff Rambosk is entitled to summary judgment on plaintiff's failure to train claim.

**V.**

Deputies DiPaolo, Chapman, Casey, and Wingo argue that they are entitled to summary judgment on the state law claims asserted in Counts V through VIII of the Amended Complaint.

**A. Negligence**

In Count V of the Amended Complaint, plaintiff asserts that Deputy DiPaolo seized him without probable cause and negligently used physical force to subdue and handcuff him. Deputy DiPaolo

31

argues that he is entitled to summary judgment because no such claim exists.    Plaintiff admits that he cannot maintain a negligence claim against Deputy DiPaolo as currently pled. Accordingly, Deputy DiPaolo's motion for summary judgment on Count V of the Amended Complaint is granted.

## B.    Malicious Prosecution

In Count VI, plaintiff asserts a state law claim for malicious prosecution against Deputy DiPaolo.   Deputy DiPaolo contends that summary judgment is warranted because plaintiff's arrest was supported by probable cause.   As previously discussed, the Court agrees.   Deputy DiPaolo's motion for summary judgment as to this count is granted.

## C.    Assault and Battery

Deputies DiPaolo, Chapman, Wingo, and Casey contend that they are entitled to summary judgment on plaintiff's assault and battery claim to the extent the Court determines that the force used was reasonable as a matter of law.   Pursuant to Florida law, police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest, and officers are only liable for damage where the force used is "clearly excessive." Davis v. Williams, 451 F.3d 759, 768 (11th Cir. 2006) (quoting City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996)). Here, the Court has found that the amount of force used by Deputies Chapman, Wingo, and Casey was not excessive; thus, they are

32

entitled to summary judgment.  Deputy DiPaolo is also entitled to summary judgment because he has shown that the force he used was not excessive.

**D.  Negligent Infliction of Emotional Distress**

In Count VIII of the Amended Complaint, plaintiff asserts a claim for negligent infliction of emotional distress.  To prevail under this theory, plaintiff must show that the negligence of another caused emotional distress.  See Elliott v. Elliott, 58 So. 3d 878, 880 (Fla. 1st DCA 2011).  Because plaintiff admits that he cannot state a claim for negligence, his claim for negligent infliction of emotional distress fails as a matter of law. Defendants' motions for summary judgment on Count VIII are therefore granted.

Accordingly, it is now

**ORDERED:**

1.  Defendant Michael DiPaolo's Motion for Summary Judgment (Doc. #34) is **GRANTED.**  Judgment shall enter in favor of defendant Michael DiPaolo on all counts.

2.  Defendants Michael Chapman, James Casey, and Kasey Wingo's Motion for Summary Judgment (Doc. #35) is **GRANTED.** Judgment shall enter in favor of defendants Michael Chapman, James Casey, and Kasey Wingo as to all counts.

3.    Defendant Kevin Rambosk's Motion for Summary Judgment (Doc. #37) is **GRANTED.**  Judgment shall enter in favor of defendant Kevin Rambosk as to all counts.

4.    The Clerk is directed to enter judgment accordingly, terminate all pending motions and deadlines, including the trial scheduled for Tuesday, April 21, 2015, and to close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this ___17th___ day of April, 2015.


_____
JOHN E. STEELE
UNITED STATES DISTRICT JUDGE


Copies:

Counsel of record